# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**SELLARS ABSORBENT MATERIALS, INC.,**
        Plaintiff,

v.                                                           Case No. 11-CV-00400

**SUSTAINABLE TEXTILE GROUP, LLC, et al.,**
        Defendants.

## DECISION AND ORDER

Plaintiff Sellars Absorbent Materials, Inc. sues several affiliated companies and their owners for repayment on two loans that plaintiff allegedly made to defendants. Before me now is plaintiff's motion for partial summary judgment.

### I. Background

All of the companies involved in this case are engaged in the business of manufacturing products made out of regenerated cotton, which consists of leftover cotton fibers from the manufacture of fabric. The first loan plaintiff seeks to collect on arises out of a supply/license agreement that plaintiff entered into on December 24, 2009 with defendants Sustainable Textiles Group, LLC ("Sustainable Textiles"), Sustainable Solutions, Inc. ("Sustainable Solutions"), Strateline Industries of Arkansas, LLC ("Strateline"), and Circle 360, LLC ("Circle"). These defendants are all affiliated with one another, and the agreement refers to them collectively as the "SSC entities." The parties entered into the supply/license agreement because plaintiff was contemplating a future joint venture with Strateline. The SSC entities needed an immediate infusion of certain raw materials and cash to help them turn their supply of regenerated cotton into finished

products, and plaintiff wanted to help the SSC entities stay in business so that plaintiff could have time to conduct due diligence.

Under the supply/license agreement, plaintiff agreed to provide the SSC entities with a "product prepayment," which included up to $204,610 worth of raw materials and up to $230,000 in cash. In exchange, defendant Circle agreed to send plaintiff shipments of regenerated cotton in January and February 2010 equal in value to the product prepayment (roughly 790,000 pounds of cotton). Payment for the regenerated cotton was to be made "via offset against the Product Prepayment," and plaintiff's obligation to deliver the product prepayment was explicitly conditioned upon the SSC entities delivering cotton to plaintiff "in strict accordance" with the schedule provided in the contract. (Decl. of Joseph A. Mayer Ex. A, §§ 3.4.1, 3.4.2, ECF No. 30.)

As security for the product prepayment, the parties established an escrow account for the benefit of plaintiff. Customers purchasing products manufactured with raw materials provided by plaintiff were directed to deposit all payments for those products into this escrow account. The SSC entities also gave plaintiff a security interest in all of their assets, and agreed that their other secured creditors would give plaintiff a first priority security interest in the raw materials provided by plaintiff, inventory created using those raw materials, and proceeds from the sale of that inventory.

After the contract was executed, defendant Strateline discovered that it could not grant plaintiff the first priority security interest required by the contract. This was a problem because Strateline was the entity which was supposed to actually receive the product prepayment and manufacture and sell goods using the product prepayment. To solve this problem, on January 12, 2010, the parties amended the agreement. First, defendant S-

2

Line Capital, LLC was added to the contract as one of the SSC entities. S-Line agreed to take Strateline's place, receiving the product prepayment and taking responsibility for manufacturing and selling goods with the raw materials supplied by plaintiff. Second, the SSC entities and defendant Kenneth Mourton, an investor in several of the SSC entities, agreed to guarantee "full and prompt repayment of the amount (in dollars) equal to the Product Prepayment," plus collection costs. (Id. Ex. B, § 3.1.)

By February 18, 2010, plaintiff had made a sizeable product prepayment to the SSC entities, and it had only received a small amount of regenerated cotton as repayment. As a result, the outstanding debt owed to plaintiff was $374,747.57. The SSC entities had delivered only 56,650 pounds of cotton to plaintiff in shipments that arrived after the deadlines set out in the contract, and, on January 29, 2010, plaintiff had agreed to return most of this cotton because defendant Mitchell Massey at Strateline urgently needed it to fill pending orders. Plaintiff only kept about 5000 pounds of cotton for itself. The SSC entities did, however, use the cotton to fill orders for finished products, which generated $119,827.72 in revenue that was deposited into the escrow account to help secure the product prepayment.

Once it became clear that the SSC entities would be unable to provide the promised shipments of regenerated cotton, plaintiff withdrew all of the money in the escrow account, a total of $284,951.14. This reduced the debt owed for the product prepayment to $89,786.43. Plaintiff then sent the SSC entities and Mourton a letter on September 16, 2010 demanding that they pay the rest of the debt. Defendants refused to do so, and plaintiff filed this lawsuit. After this lawsuit was filed, Mourton informed plaintiff that an additional $19,491.24 had been deposited into the escrow account after plaintiff had

emptied it. As a result, plaintiff made a second withdrawal on August 25, 2011 and further reduced the product prepayment debt to $70,295.19.

The second loan at issue in this case was made pursuant to a promissory note executed by defendant Kayren Joy Nunn on April 26, 2010 (the "note"). Nunn is the CEO and a member of Circle, and she is also an investor in several of the other SSC entities. In April 2010, Nunn asked plaintiff to loan Circle $250,000 because Circle was in need of immediate cash to make payroll. Nunn also proposed that plaintiff enter into a partnership with Circle. Plaintiff agreed to consider a future partnership and to make an immediate loan to Nunn, who could then make a loan to Circle. Prior to requesting this loan, Circle had been pursuing a partnership with a German company, Lenzing Aktiengesellschaft ("Lenzing"). But by the time Nunn signed the note, negotiations between Circle and Lenzing had broken down.

On April 26, 2010, in exchange for plaintiff's promise to loan Circle $250,000, Nunn executed the note, in which she promised to repay the principal amount advanced plus 2% interest by April 25, 2011. This added up to $254,976.99. Nunn also agreed to pay 6% interest on any amount owing after the note's maturity date plus the reasonable costs of collection, including attorneys fees. As part of the deal, Circle agreed to refrain from entering into any new partnerships with other companies for five months while plaintiff conducted due diligence.

To ensure repayment of the loan, the parties executed several related agreements. Two other companies that are owned by Nunn and affiliated with Circle, defendants TIG Ventures, LLC ("TIG") and Nunn Holdings, LLC ("Nunn Holdings"), entered into a "Guaranty Agreement" in which they agreed to be jointly and severally liable for repayment of the

note. They also executed two security Agreements in which they granted plaintiff a security interest in all of their assets. Nunn entered into a "Pledge Agreement" in which she pledged her membership interest in Nunn Holdings to secure repayment under the note. Nunn Holdings, which is a member of TIG, pledged its membership interest in TIG, and TIG, which is a member of Circle, pledged its membership interest in Circle. Finally, pursuant to a "Collateral Pledge Agreement," Nunn granted plaintiff a security interest in the promissory note and security agreement Circle provided to her in exchange for the $250,000 loan it received from Nunn. This complicated series of security agreements was driven by the complex nature of defendants' legal relationships with one another.

As soon as these agreements were executed, plaintiff transferred the first $150,000 of the loan to Nunn, and on May 5, 2010, plaintiff paid Nunn the remaining $100,000. Nunn avers that she then loaned all of this money to Circle. None of the defendants has yet to repay any of the money due under the note.

## II. Discussion

In this case, plaintiff seeks compensation from defendants for the loans it made under the supply/license agreement and the April 26, 2010 promissory note. Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The interpretation of an unambiguous, written contract presents a question of law. Town Bank v. City Real Estate Development, LLC, 330 Wis. 2d 340, 355 (2010). A contract should be interpreted to give effect to the parties' intent, as expressed in the contractual language, and the language should be read

5

consistent with what a reasonable person would understand the words to mean under the circumstances. Seitzinger v. Community Health Network, 270 Wis. 2d. 1, 15 (2004). I apply Wisconsin law to this case because the agreements between the parties contain choice-of-law provisions calling for the application of this state's law. See Bush v. Nat'l School Studios, Inc., 139 Wis. 2d 635, 642 (1987).

A. **Debt Owed Under the December 24, 2009 Supply/License Agreement**

The supply/license agreement as originally executed is a valid, arms-length agreement. I find that the contract is an arms-length agreement, and not a joint venture, because the parties did not enter into any sort of profit-sharing arrangement. See Edelbeck v. Hooten, 20 Wis. 2d 83, 88 (1963). And, while defendant Mourton's affidavit claims that the signature above his name on the agreement is not his own and that defendant Nunn, who signed the contract on behalf of Sustainable Textiles and Strateline, lacked authority to do so, his brief in opposition to summary judgment does not challenge the validity of the signatures on the contract. Thus, he forfeits this argument.

The January 12, 2010 amendment is also valid and supported by consideration. Any performance or return promise that is bargained for constitutes valid consideration. Restatement (Second) of Contracts § 71 (1981). By January 12, the SSC entities had missed two of the deadlines for cotton deliveries and it was clear that Strateline would not be able to provide the security interest required by the agreement. Plaintiff agreed to ignore these breaches of the contract in exchange for S-Line's promise to take Strateline's place, and the SSC entities' and Mourton's promise to guarantee repayment of the product

6

prepayment in cash. Thus, the parties bargained for and received promises from one another.

There is also no evidence that the amendment is unconscionable or that defendants signed it because they were under economic duress. A contract is only unconscionable if it is both procedurally and substantively unconscionable. Wisconsin Auto Title Loans, Inc. v. Jones, 290 Wis. 2d 514, 532 (2006). "Determining whether procedural unconscionability exists requires an examination of the factors that bear upon the formation of the contract, that is, whether there was 'a real and voluntary meeting of the minds' of the contracting parties." Id. at 534. Here, there is no evidence of procedural unconscionability. While the SSC entities claim they had no choice but to sign the contract because they were in a difficult financial position, there is no evidence that plaintiff caused defendants' financial problems. Between December 24, 2009 and January 12, 2010, plaintiff complied with all of its obligations under the supply/license agreement. It transferred $100,000 to the SSC entities and began working to gain access to the raw materials the SSC entities needed. Plaintiff did fail to meet the delivery dates for raw materials set out in the contract, but these dates were "estimates only" and they were contingent upon defendants delivering regenerated cotton on time. (Mayer Decl. Ex. A, Appendix A.) Therefore, I find that defendants' decision to work with plaintiff as opposed to someone else was voluntary. For similar reasons, I conclude that the amendment was not the product of economic duress. To prove economic duress, defendants must prove that plaintiff committed a "wrongful or unlawful act" that deprived defendants of their "unfettered will" and resulted in an unfair exchange. Wurtz v. Fleischman, 97 Wis.2d 100, 109–110 (1980). Plaintiff did not commit any wrongful acts that forced the SSC entities to sign the amendment.

Applying the terms of the amended agreement, I find that the SSC entities have a duty to repay plaintiff for the product prepayment. The contract makes it clear that the parties intended the SSC entities to reimburse plaintiff for the product prepayment by delivering shipments of regenerated cotton over two years ago. Yet, the SSC entities have only delivered a fraction of the promised shipments, and in September 2010, the SSC entities refused plaintiff's formal demand for repayment. Thus, the SSC entities are in default and plaintiff is entitled to $70,295.19 in compensation.

Plaintiff is entitled to this compensation even though it failed to salvage leftover raw materials and finished products from Strateline's Arkansas facility. There is no provision of the contract that requires plaintiff to salvage these kinds of materials before attempting to collect the balance owed on the product prepayment. The SSC entities' argument that plaintiff is not entitled to repayment because plaintiff sabotaged defendants' business is also meritless. The SSC entities claim that plaintiff told Rockline, one of Strateline's biggest customers, that Strateline was having financial problems and that, as a result, Rockline cancelled two large orders. The only evidence offered to support this claim is Nunn's affidavit, which states that the customer told her about plaintiff's comments. Since this evidence is inadmissible hearsay, I must reject this claim. See Fed. R. Evid. 801(c).

The SSC entities and Mourton are also jointly and severally liable for repayment of the debt as guarantors under the guarantee agreement contained in the January 12 amendment. Mourton claims that his duty to guarantee the loan is unenforceable because the parties' agreement to have plaintiff return 51,298 pounds of cotton to the SSC entities was a material alteration of the contract made without his consent. A material alteration in a contract made after execution and without the consent of the guarantor can void the

obligation of a guarantor if the alteration increases the guarantor's obligation. Baumgarten v. Bubolz, 104 Wis. 2d 210, 215 (Wis. Ct. App. 1981). But the agreement to return the cotton benefitted Mourton. The cotton on its own, valued at $0.55 per pound, would have reduced the product prepayment debt by $28,560.40. Because plaintiff returned the cotton, the SSC entities were able to fill orders for finished products and to reduce the debt owed on the product prepayment by over $119,000. Thus, the return of the cotton did not void Mourton's obligation as a guarantor.

For all of the foregoing reasons, I find that the SSC entities and Mourton are jointly and severally liable to plaintiff for the $70,295.15. Plaintiff has asked for prejudgment interest on this amount at a rate of 5% per annum from September 21, 2010, the date defendants refused plaintiff's demand letter. Since defendants have not presented any opposition to the request for prejudgment interest, I will grant it. Defendants are also liable under the express terms of § 3.1 of the amendment to the contract for the cost of collection incurred by plaintiff, which includes reasonable attorneys fees.

**B.**   **Transfer of Collateral Securing the Supply/License Agreement**

After default, a secured party is entitled to take possession of collateral used to secure a debt for the purpose of disposing of that collateral to satisfy the debtor's obligation. Wis. Stat. § 409.609. A secured party does not have to hold a first priority security interest to exercise this right. Id. In § 3.4.2 of the supply/license agreement, the SSC entities granted plaintiff a security interest in all of the SSC entities' assets, which are described in Appendix F to the contract. Because the SSC entities are now in default, I find that plaintiff has the right to take possession of all of the assets described in Appendix F.

In reaching this conclusion, I reject defendants' argument that some of the assets involved cannot be transferred to plaintiff because they are intellectual property assets that will lose their value if plaintiff takes possession of them. Defendants have not identified any specific assets that would lose their value.

Since most if not all of the SSC entities' assets are located in states outside of this court's jurisdiction, this court's ability to enforce plaintiff's right to possession of the collateral is limited. However, plaintiff is free to ask a court in another jurisdiction to enforce this court's judgment with respect to the transfer of specific assets located within that jurisdiction.

**C.     Debt Owed Under the April 26, 2010 Promissory Note**

The plain and unambiguous terms of the note executed by Nunn indicate that plaintiff loaned Nunn the principal sum of $250,000, and that Nunn promised to pay back this loan, with interest, by April 25, 2011. The note states that interest shall accrue "on the outstanding balance owing under this Note at a rate of two percent (2%) per annum, compounding annually." (Mayer Decl. Ex. J.) But, if debtor defaults on the loan, the interest rate increases to "six percent (6%) per annum, compounding annually." Id. Nunn seeks to introduce extrinsic evidence to prove that the parties never intended Nunn or Circle to repay the loan in cash. She claims that plaintiff promised to invest in Circle and to allow defendants to repay the loan as an offset against plaintiff's investment. This evidence is inadmissible under the parol evidence rule because it contradicts the express and unambiguous terms of the note. See Town Bank v. City Real Estate Development, LLC, 330 Wis. 2d 340, 357–58 (2010); In re Spring Valley Meats, Inc., 94 Wis. 2d 600, 607–08

(1980). The argument that the loan was some sort of early investment in Circle is directly contradicted by the contract's requirement that Nunn repay the loan by "payment of cash or readily available cash equivalents." Id. Therefore, I conclude that Nunn is in default and is liable to plaintiff for $250,000 plus interest.

Defendants cannot successfully raise any affirmative defenses to the enforcement of either the note or the related security agreements. Nunn signed the note and related agreements because Circle was experiencing financial difficulties, and she believed doing business with plaintiff would solve those difficulties. While Nunn may have felt that she had no option but to do business with plaintiff, there is no evidence that Circle's financial problems were plaintiff's fault. As discussed above, plaintiff did not breach the supply/license agreement. And, while Nunn claims that plaintiff forced Circle to forgo a lucrative partnership with Lenzing, emails exchanged between the parties in February 2010 indicate that plaintiff in fact encouraged this partnership. (Decl. of K. Joy Nunn Ex. E, ECF No. 58.) Despite plaintiff's support, the Lenzing deal fell through, and it did so before plaintiff asked Circle to agree to a five-month moratorium on new partnerships. Therefore, there is no evidence that plaintiff took any action that forced Nunn to sign the note and related agreements. These agreements are not unconscionable and they are not the product of economic duress.

Nunn has succeeded, however, in arguing that the maturity date on the note was modified slightly after execution. Because plaintiff did not distribute the full amount of the loan until May 5, 2010, Nunn argues that the maturity date on the note should be pushed back from April 25, 2011 to May 5, 2011. Plaintiff did not respond to this argument, so I will accept that the contract was modified. However, even with this modification, Nunn is still

clearly in default. Since Nunn is in default, TIG and Nunn Holdings, as guarantors, are jointly and severally liable for repayment of the loan. Nunn, Nunn Holdings, and TIG are also liable for plaintiff's reasonable collection costs, including attorneys fees.

**D.     Transfer of Collateral Securing the Promissory Note**

TIG and Nunn Holdings each executed a security agreement that gave plaintiff a security interest in all of their property, as described in § 2 of the security agreements, to secure their obligation as guarantors. (Mayer Decl. Ex. L, M.) Since both TIG and Nunn Holdings are now in default on their obligation to repay plaintiff, I conclude that plaintiff has the right to take possession of the assets described in § 2 of the security agreements. See Wis. Stat. § 409.609.

Pursuant to the pledge agreements executed by Nunn, TIG, and Nunn Holdings, plaintiff is also entitled to take possession of Nunn's membership interest in TIG, TIG's membership interest in Nunn Holdings, and Nunn Holdings' membership interest in Circle. These membership interests were offered as collateral to secure Nunn, TIG, and Nunn Holdings' obligations to make payments under the note. Pursuant to the collateral pledge agreement executed by Nunn, plaintiff is also entitled to take possession of Nunn's right, title, and interest in the promissory note dated April 26, 2010 from Circle and the security agreement from Circle related to that note. While it may turn out that the Circle note and security agreement are unenforceable because Mourton, who is a 49% member in Circle, claims that he has no knowledge of Circle ever receiving a loan from Nunn, plaintiff is entitled to whatever legal rights Nunn does have in the promissory note and security agreement from Circle.

**THEREFORE, IT IS ORDERED** that plaintiff's motion for partial summary judgment [DOCKET #29] is **GRANTED**.

**IT IS FURTHER ORDERED** that defendants Sustainable Textile Group, LLC, Sustainable Solutions Inc., Strateline Industries of Arkansas, LLC, Circle 360, LLC, and Kenneth Mourton are jointly and severally liable to plaintiff for the sum of $70,295.19 plus prejudgment interest at a rate of 5% per annum from September 21, 2010 and reasonable collection costs, including attorneys fees and costs.

**IT IS FURTHER ORDERED** that plaintiff is entitled to take possession of all of the assets belonging to Sustainable Textile Group, LLC, Sustainable Solutions Inc., Strateline Industries of Arkansas, LLC, and Circle 360, LLC listed in Schedule 1 attached hereto for the purpose of disposal and sale to satisfy the judgment obligations of these defendants to plaintiff**.**

**IT IS FURTHER ORDERED** that defendants Karyen Joy Nunn, TIG Ventures, LLC, and Nunn Holdings, LLC are jointly and severally liable to plaintiff for the sum of $250,000, the principal amount outstanding on the April 26, 2010 promissory note, plus unpaid interest of $4,936.99 through May 5, 2011, plus additional interest on $250,000 at the rate of 6% per annum, compounded annually from May 5, 2011 and reasonable collection costs, including attorneys fees and costs.

**IT IS FURTHER ORDERED** that plaintiff is entitled to take possession of all of the assets belonging to TIG Ventures, LLC, and Nunn Holdings, LLC listed in Schedule 2 attached hereto for the purpose of disposal and sale to satisfy the judgment obligations of these defendants to plaintiff.

**IT IS FURTHER ORDERED** that plaintiff is entitled to take possession of defendant Kayren Joy Nunn's membership interest in Nunn Holdings, LLC (and all dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of that membership) for the purpose of disposal and sale by plaintiff to satisfy Nunn's obligations to plaintiff.

**IT IS FURTHER ORDERED** that plaintiff is entitled to take possession of defendant Nunn Holdings, LLC's membership interest in TIG Ventures, LLC (and all dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of that membership) for the purpose of disposal and sale by plaintiff to satisfy Nunn Holdings' obligations to plaintiff.

**IT IS FURTHER ORDERED** that plaintiff is entitled to take possession of defendant TIG Ventures, LLC's membership interest in Circle 360, LLC (and all dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of that membership) for the purpose of disposal and sale by plaintiff to satisfy TIG Ventures' obligations to plaintiff.

Dated at Milwaukee, Wisconsin, this 2nd day of April, 2012.

s/_____
LYNN ADELMAN
District Judge

Schedule 1

(a)     Inventory: All inventory of the company, whether now owned or hereafter acquired and wherever located and other tangible personal property held for sale or lease or furnished or to be furnished under contracts of service or consumed in the company's business;

(b)     Equipment: All equipment of the company, whether now owned or hereafter acquired and wherever located, including but not limited to all present and future equipment, machinery tools, motor vehicles, trade fixtures, furniture, furnishings, office and record keeping equipment and all goods for use in the company's business;

(c)     Accounts, Contract Rights and Other Rights to Payment: Each and every right of the company to the payment of money, whether such right to payment now exists or hereafter arises, whether such right to payment arises out of a sale, lease or other disposition of goods or other property by the company, out of a rendering of services by the company, out of a loan by the company, out of the overpayment of taxes or other liabilities of the company, or otherwise arises under any contractual or agreement, whether such right to payment is or is not already earned by performance, and howsoever such right to payment may be evidenced, together with all other rights and interests (including all liens and security interests) which the company may at any time have by law or agreement against any account debtor or other obligor obligated to make any such payment or against any of the property of such account debtor or other obligor: all including but not limited to all present and future debt instruments, chattel papers, accounts, contract rights, loans and obligations receivable, tax refunds and lease receivables;

(d)     Instruments: All instruments, chattel paper, letters of credit or other documents of the company, whether now owned or hereafter acquired, including but not limited to promissory notes, drafts, bills of exchange and trade acceptances, all rights and interests of the company, whether now existing or hereafter created or arising, under leases, agreements or other contracts;

(e)     Deposit Accounts: All right, title and interest of the company in all deposit and investment accounts maintained with any bank, savings and loan association, broker, brokerage, or any other financial institution. Together will all monies and other property deposited or held therein, including, without limitation, any checking account, savings account, escrow account, savings certificate and margin account; and

(f)     General Intangibles: All general intangibles of the company, whether now owned or hereafter acquired, including, but not limited to, applications for patents, copyrights, trademarks, trade secrets, good will, trade names, customer lists, permits and franchises, and the right to use the company's name;

Together with all substitutions and replacements for and products of any of the foregoing property and proceeds of any and all of the foregoing property and, in the case of all tangible collateral, together with (i) all accessories, attachments, parts, equipment, accessions and repairs now or hereafter attached or affixed to or used in connection with any such goods, (ii) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods, (iii) insurance proceeds, and (iv) all books and records of the company.

Schedule 2

The following properties, assets and rights of TIG Ventures, LLC or Nunn Holdings, LLC, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof and any additions, replacements, accessions and substitutions to or for the properties, assets and rights: all personal and fixture property of every kind and nature including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, accounts (including accounts receivable), any other contract rights and rights to the payment of money, insurance claims and proceeds, tort claims, and all general intangibles including without limitation, all payment intangibles, patents, patent applications, trademarks, trademark applications, trade names, copyrights, copyright applications, software, engineering drawings, service marks, customer lists, goodwill, and all licenses, permits, agreements of any kind or nature pursuant to which TIG Ventures, LLC or Nunn Holdings, LLC possesses, uses or has authority to possess or use property (whether tangible or intangible) or others or others possess, use or have authority to possess or use property (whether tangible or intangible) of TIG Ventures, LLC or Nunn Holdings, LLC, and all recorded data of any kind or nature, regardless of the medium of recording including, without limitation, all software, writings, plans, specifications and schematics.